CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG - 1 2017

JULIA C. DUDLEY, CLERK
BY: /s/ M. Happ
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

MALCOLM MUHAMMAD,      )     Civil Action No. 7:16-cv-00500
    Plaintiff,            )
                         )
v.                      )     **MEMORANDUM OPINION**
                         )
Y. TAYLOR, et al.,        )     By:    Hon. Jackson L. Kiser
    Defendants.      )             Senior United States District Judge

Malcolm Muhammad, a Virginia inmate proceeding pro se, commenced this civil rights action pursuant to 42 U.S.C. §§ 1983 and 2000cc-1, naming numerous current and former officials of the Virginia Department of Corrections ("VDOC") as defendants.[1] Plaintiff alleges that Defendants retaliated against him in violation of the First Amendment, prevented him from practicing his religion in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and transferred him and increased the length of his sentence in violation of the Fourteenth Amendment.[2] Defendants filed motions to dismiss and for summary judgment, asserting, inter alia, the defenses of qualified immunity and failure to exhaust available administrative remedies.[3] Plaintiff responded, making this matter ripe for disposition.[4] After reviewing the record, I grant the motion to dismiss and grant in part and deny in part the motion for summary judgment.

---

[1] Plaintiff inserted a motion to amend the complaint in the same envelope by which he filed the complaint. The defendants noted its presence with the complaint and treated the motion to amend as a supplement to the complaint. I liberally construe the complaint and motion to amend at docket entry one as a single complaint.

[2] In the complaint, Plaintiff also briefly alleged an Eighth Amendment violation relating to his confinement at Red Onion State Prison ("Red Onion"). In his response to defendants' motion for summary judgment, he explicitly abandons the claim and does not oppose Defendants' arguments that he does not state a violation of the Eighth Amendment that was clearly established at the time of the events. Consequently, there is no dispute of material fact as to the Eighth Amendment claim, and Defendants are entitled to summary judgment in that regard.

[3] The court previously granted Defendants a protective order from discovery on account of their assertion of qualified immunity.

[4] Plaintiff filed a reply to the answer that I had not authorized in accordance with Federal Rules of Civil Procedure 7(a)(7) and 12(a)(1)(C). Consequently, that reply does not constitute a pleading that is allowed under the Federal Rules of Civil Procedure or afforded liberal construction, and I do not consider it. See, e.g., McNeil v. United States, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil

A. The Relevant Facts

Before commencing this action and while at Keen Mountain Correctional Center ("KMCC") in April 2014, Plaintiff had twice sued defendant Wicker, who is the Chaplain at KMCC, and thrice sued defendant Y. Taylor, who is both the Institutional Program Manager and the Institutional Classification Authority ("ICA"), for perceived violations of federal rights. See 7:14cv540, 7:15cv8, and 7:15cv57. The first case, 7:14cv540, and the second case, 7:15cv8, were both captioned Muhammad v. Fleming, et al. The first case was never served on any defendant, but in the second case, the court sent waivers of service of process to the Office of the Attorney General of Virginia on February 23, 2015, for all defendants, including Taylor. The final case, 7:15cv57, was captioned Muhammad v. Y. Taylor, et al. The court's first order bearing this caption was entered on February 9, 2015, and sought Plaintiff's financial data. The court entered it service order in case 7:15cv57 on April 6, 2015.

Plaintiff contends that these three cases are notable because they and Plaintiff administrative grievances form Taylor's and Wicker's bases to retaliate against him. Plaintiff alleges that the other defendants in this case violated federal rights and retaliated against him in support of Taylor and Wicker "by denying him . . . [f]ree exercise of his religion[,]. . . . placing

---

litigation should be interpreted so as to excuse mistakes by those who proceed without counsel." (alteration added; footnote number omitted)); Jourdan v. Jabe, 951 F.2d 108, 109-10 (6th Cir. 1991) (holding that a pro se litigant is not entitled to special consideration to excuse a failure to follow a straightforward procedural requirement that a lay person can comprehend as easily as a lawyer); Sherrill v. Holder, No. 12-00489, 2013 U.S. Dist. LEXIS 190373, at *1, 2013 WL 11316921, at *1 (D. Az. June 25, 2013) ("This Court did not grant Plaintiff leave to file a reply to Defendant's Answer. Further, the Court does not find any basis to permit Plaintiff to file a reply to the Defendant's Answer in this case. As such, Plaintiff's Response to Defendant's Answer is stricken from the record."). Nonetheless, Plaintiff is not prejudiced because "[i]f a responsive pleading is not required, an allegation is considered denied or avoided." Fed. R. Civ. P. 8(b)(6).

him in segregation, retaliat[ing] for accessing courts, [inflicting] cruel and unusual punishment, transferr[ing] [him] to a maximum prison, [and] [violating] due process. . . ."

Plaintiff's litany of retaliation begins on January 28, 2015, after Plaintiff signed an attendance sheet for both himself and his cellmate upon entering the room for his Nation of Islam ("NOI") religious service at KMCC. Wicker reported this fact to Taylor, who chastised Plaintiff by saying, "You have a nerve to be throwing stones at me. You better stop throwing because I have a bigger stone to throw."

Plaintiff believes "stones" represented Plaintiff's grievances and the three prior civil actions, even though no order with a caption Muhammad v. Y. Taylor, et al. had been docketed yet. Nonetheless, Taylor's and Wicker's alleged retaliation began after Taylor's "throwing stone" statement and after the court entered its conditional filing order in Muhammad v. Y. Taylor, et al. and the Business Office ostensibly alerted Taylor of that lawsuit on February 17, 2015.

Three days later on February 20, 2015, Taylor had Plaintiff assigned to segregation. Wicker allegedly reported to Taylor that Plaintiff had made an "inflammatory statement" during a prior NOI service. It would not be until March 2015 that Plaintiff would learn that he would not be charged for the alleged inflammatory statement, "We going to keep a record of our own attendance because we know what we are dealing with."

Even though he was not charged because of Wicker's accusation, Plaintiff's assignment to segregation triggered a search of his property per prison policy. The ramifications of that search also form the bases of this lawsuit against other defendants.

As a consequence of Plaintiff's move to segregation, two correctional officers inventoried Plaintiff's personal property on February 20, 2015. They confiscated some newspapers and a damaged coax cable. Plaintiff does not have a claim about these items.

However, defendant Hurt, a KMCC Property Officer, searched Plaintiff's personal property approximately three days later and discovered an "altered," "homemade" long-sleeve grey T-shirt. The alleged alteration was that the sleeves were not original to the shirt and had been re-sewn on to the shirt. Plaintiff alleges that the shirt had never been altered since he had received it from a former cellmate a year earlier. Plaintiff also explains that the shirt is available to purchase from the commissary.

Hurt reported the shirt to defendant Arms, who is KMCC's Institutional Investigator. Arms charged Plaintiff with offense code 132, "Possession/Construction of a Device Designed to Deceive Staff, to include, but not limited to, the Fabrication of a Dummy," because the gray shirt purportedly resembled security staff's long sleeve uniform shirt.

Plaintiff sought discovery from defendants Lowe, Arms, Assistant Warden Clary, and Captain Lee before the disciplinary hearing. Plaintiff asked them to review video recordings showing him wearing the shirt in full view of security staff, and he asked that the shirt be brought to the hearing. Lowe, Arms, Assistant Warden Clary, and Captain Lee denied the requests to review the video recordings. Lowe also denied Plaintiff's pre-hearing request for three inmate witnesses who would have testified Plaintiff had received the shirt from a prior cellmate and that Plaintiff had possessed it before security staff wore gray shirts.

Lowe conducted Plaintiff's disciplinary hearing on March 3, and both Plaintiff and Arms attended. Arms brought the gray shirt, but Plaintiff argued that it had been modified while in or Hurt's or Arms' possession. Plaintiff alleges that either Hurt or Arms altered the shirt after it

4

was confiscated. By cutting off the sleeves and then resewing them with "fresh double pure white" machined stitches.

Lowe found Plaintiff guilty of code 132 and penalized him with ninety days' loss of good-conduct time. Lowe based his decision on the reporting officer's testimony, Plaintiff's alleged testimony that the shirt belonged to him, and because the shirt closely resembled staff's uniform. Plaintiff filed a grievance that the shirt had been modified, but the grievance was rejected as non-grievable. Also, Plaintiff appealed the conviction to defendant Warden Kiser, who upheld Lowe's decisions.

Plaintiff next appealed the conviction to defendant Ponton, who is a VDOC Regional Ombudsman. It would take Ponton three months to adjudicate the appeal. During that time, staff allegedly continued to retaliate against Plaintiff and violate federal law.

Because of the conviction, Plaintiff needed a new classification report. Defendant Kegley, who was Plaintiff's counselor, handed Plaintiff an allegedly erroneous classification report on March 4. Plaintiff argued that the report erroneously added two classification points that would have ensured his transfer to Red Onion. Kegley said that he merely delivered the report and that Taylor had prepared it. Nonetheless, Kegley fixed the report by deducting the two points.

Plaintiff filed a grievance about the two erroneously added points. Instead of recognizing that the two points had been added erroneously, defendant Sykes allegedly conspired to cover-up the errors by adding three extra points. Notably, Kegley's and Sykes' modifications did not matter because it was Taylor's allegedly erroneous report that was sent to VDOC's Central Classification Services ("CCS") for approval despite Plaintiff's objections.

On March 5, Taylor conducted Plaintiff's ICA security level hearing, which was based on the allegedly erroneous report. Plaintiff alleges that he never received notice of the hearing and that he was not present. Taylor ultimately recommended that Plaintiff's security level be increased two levels from Level 4 to Level S, that he be transferred to Red Onion as a Level S inmate, and that his good-conduct time earning level be reduced.

Defendant Clary approved the recommended the increase from Level 4 to Level S and the transfer to Red Onion. The VDOC's CCS approved Clary's security level and transfer recommendations on March 10. Additionally, defendant G. K. Washington, who is the former Regional Operations Chief, ordered that Plaintiff be "assign[ed] Security Level-S based on score of 43 points and serious nature of recent 132 infraction w[h]ere offender made a uniform shirt that could have been used to deceive and gain access to the outer perimeter. Offender is to be assigned to [L]evel S and transferred to Red Onion State Prison."

Sykes conducted another ICA hearing on March 24, and per Washington's request, recommended Plaintiff be transferred to Red Onion as a Level S inmate. Sykes wrote the ICA hearing to suggest Plaintiff was at the hearing, but Plaintiff denies having been present. By March 26, defendants Warden Kiser and Mathena had approved Washington's request, and Plaintiff was transferred to Red Onion as a Level S inmate on April 2.

On June 7, Ponton concluded his review of the conviction for the gray shirt. Ponton reduced the conviction from offense code 132, "Possession/Construction of a Device Designed to Deceive Staff," to offense code 111, "Intentionally Destroying, Altering, Damaging, or

Defacing State or any Person's Property."[5] In his memorandum to Warden Kiser, Ponton explained:

> While I do not believe that it is the offender's intention to deceive the staff at KMCC or to use this shirt as anything other than something to wear while exercising (as he claimed), I cannot ignore the fact that based on the testimony given by the Reporting Officer, as well as the accused, the shirt should not have been in his possession, and it should not have been altered from its original form. To that end, I feel that the 111 charge is more appropriate in this case.
>
> This case was discussed at length by the entire Offender Discipline Unit before this decision was reached, and everyone involved agreed that, based on the facts presented, it was highly unlikely that the offender had any intentions of deceiving the staff at KMCC with this shirt, due both to the fact that he wore it several times in full view of staff, and because it lacked a collar, insignia, or anything else which would lead a person to believe that whoever was wearing the shirt was anything other than an offender.

Notably, Ponton did not order another hearing before simultaneously charging and convicting Plaintiff for the 111 charge, and he did not alter the penalty of forfeiture of 90 days' good-conduct time that had been imposed for the vacated code 132 conviction. Plaintiff objected to not having a hearing on the new charge before being convicted of it, but Warden Kiser said there was no need for another hearing to support Ponton's decision.

By early September 8, 2015, staff at Red Onion had learned of the change in the conviction from code 132 to code 111, conducted a new ICA hearing, and reduced Plaintiff's security level from Level S to Level 5. On October 23, 2015, Plaintiff was transferred to Wallens Ridge State Prison, where he remained in segregation for forty days before being released into general population.

---

[5] The VDOC considers code 111 a lesser included offense of code 132.

B. THE RELEVANT GRIEVANCES

1. About the initial transfer to segregation for the "inflammatory statements"

Plaintiff filed an informal complaint, alleging that Wicker and Taylor discriminated against him for being an NOI adherent by alleging he made an inflammatory statement. After not receiving a response to the informal complaint, Plaintiff filed a regular grievance, writing, "[T]his informal complaint was not responded to by the next action date of today 3-10-15. Case No. KMCC-15-INF-00751. I want this responded to ASAP." The grievance was rejected at intake as non-grievable because the grievance complained about not receiving a response on the informal complaint and not about the issue discussed in the informal complaint. Plaintiff appealed, but he did not challenge the disposition of the regular grievance. Instead, he reverted back to the argument in the informal complaint about Wicker's and Taylor's alleged discriminatory acts. The Regional Ombudsman upheld the intake decision as non-grievable, noting that policy allowed him to file a regular grievance about the issues raised in the informal complaint once the time expired for staff to respond.

Plaintiff refiled an informal complaint and then a lengthy regular grievance about, inter alia, Wicker's allegation of an inflammatory statement, Wicker's behavior during NOI services, Wicker's poor record keeping, Wicker's retaliation, Plaintiff being placed in segregation, and Plaintiff being interviewed by Arms. The grievance was rejected at intake as presenting more than one issue, and the Regional Ombudsman upheld the intake decision on appeal.

Plaintiff submitted a new grievance, limiting the issue to "why [he] was placed in segregation" as "retaliation" and requesting an investigation of Wicker as the action to be taken. This second grievance ostensibly was rejected at intake or deemed unfounded because, although there is no documentation in the record, Plaintiff appealed that disposition to the Regional

Ombudsman. (ECF No. 36-8, pageid# 488.) The record reflects that the Regional Ombudsman received the appeal, but the record does not reflect the Regional Ombudsman's adjudication.

## 2. About the gray shirt and related retaliation

Plaintiff filed an informal complaint about how Arms presented the altered gray shirt during the disciplinary hearing in retaliation for Plaintiff filing grievances and "making complaints." Arms responded, "[T]he shirt was not altered in any way to change the condition or appearance of the shirt from the condition the shirt was in when it was confiscated . . . ." Plaintiff filed a related regular grievance seeking an investigation of Arms' alleged retaliatory false testimony, and defendant Webb, who is KMCC's grievance coordinator, rejected the grievance at intake as non-grievable. A Regional Ombudsman upheld that decision on appeal.

## 3. About the erroneous classification report delivered by defendant Kegley

Plaintiff filed a regular grievance about the two erroneous points in the initial report delivered by Kegley and allegedly prepared by Taylor. Warden Kiser deemed the grievance founded and admitted the error. Warden Kiser further noted that the error was corrected during the ICA hearing on March 24, 2015. Ponton upheld Warden Kiser's decision on appeal.

## 4. About not being present at the ICA hearing on March 24, 2015

On April 12, 2015, Plaintiff purportedly mailed a regular grievance from Red Onion to Webb at KMCC about the ICA hearing held on March 24, 2015. Plaintiff denied having received advance notice of the ICA hearing and denied having been present. Plaintiff also noted that he was not aware of the ICA hearing until April 7, 2015.

After not hearing back from Webb, Plaintiff purportedly filed a self-styled appeal with the Regional Office on May 19, 2015, complaining how Webb had not responded to the grievance. On May 22, 2015, Webb wrote Plaintiff a letter, denying ever having received that

grievance. On June 7, 2015, Plaintiff resent the purported missing grievance to Webb and informed Webb that he had already appealed Webb's failure to respond to the Regional Office. Webb's office received the second copy of the grievance on June 18, 2015. Webb replied by a letter dated June 23, 2015, explaining that the grievance was not complete and appeared to be untimely filed.

On June 30, 2015, Plaintiff wrote defendant Locust, who is VDOC's statewide grievance coordinator, to notify her that he had not received a response from Webb or the Regional Office. After not hearing back from her, Plaintiff sent Locust another letter on July 14, 2015, about the ICA hearing and a grievance Webb had rejected. On July 22, 2015, Plaintiff sent her a letter about how the Regional Ombudsman had sent him an unsigned Level II response.

Locust responded by sending him three letters. In her final letter, Locust explained that she was aware of his complaint about not being at the ICA hearing on March 24, 2015, and directed him to submit his request to the appropriate person. Locust also noted, "No additional response will be provided and your paperwork is being returned to you for your record."

5. About requesting a rehearing after Ponton's appeal decision

Plaintiff filed a regular grievance seeking a hearing after Ponton vacated the code 132 conviction and convicted him for violating code 111. Webb rejected the grievance at intake as non-grievable, and the Regional Ombudsman upheld that decision.

## II.

Defendants filed a motion for summary judgment arguing, inter alia, the defenses of qualified immunity and exhaustion of available administrative remedies. A party is entitled to summary judgment if the pleadings, the disclosed materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); see Williams v. Griffin,

952 F.2d 820, 823 (4th Cir. 1991) (recognizing a party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant). "Material facts" are those facts necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. Summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248.

Even if there is no dispute as to the evidentiary facts, summary judgment is not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Instead, a court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v.

Harris, 550 U.S. 372, 380 (2007). Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). A plaintiff cannot use a response to a motion for summary judgment to amend or correct a complaint challenged by the motion for summary judgment. See, e.g., Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009) (noting that a plaintiff may not amend a complaint through argument in a brief opposing summary judgment).

A. QUALIFIED IMMUNITY

Defendants argue that they are entitled to qualified immunity.[6] Qualified immunity is "an immunity from suit rather than a mere defense to liability," and it is therefore "effectively lost if a case is erroneously permitted to go to trial." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Indeed, the "driving force" behind the doctrine is the "desire to ensure that 'insubstantial claims against government officials [will] be resolved prior to discovery.'" Id. (alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987)).

Qualified immunity protects public officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); see In re Allen, 106 F.3d 582, 593

---

[6] Defendants cite Ward v. Johnson, 690 F.2d 1098-1109-13 (4th Cir. 1982), and argue that they are entitled to absolute immunity for their decisions made in institutional disciplinary hearings and appeals. When seeking absolute immunity, a government official bears a heavy burden of demonstrating that overriding public policy considerations warrant such exceptional protection. Defendants have not done so, and furthermore, they do not address Cleavinger v. Saxner, 474 U.S. 193, 206-07 (1985), which held that prison officials involved in disciplinary decisions are entitled to qualified, not absolute, immunity, for quasi-judicial functions. Moreover, defendants waived the defense of absolute immunity by not pleading it in their answer. See, e.g., Fed. R. Civ. P. 8(c); Gomez v. Toledo, 446 U.S. 635, 640 (1980). Consequently, I consider whether defendants are entitled to qualified, and not absolute, immunity.

(4th Cir. 1997) ("[A]n official may claim qualified immunity as long as his actions are not clearly established to be beyond the boundaries of his discretionary authority."). In conducting the qualified immunity analysis, the first task is to identify the "specific" right "at a high level of particularity" that the plaintiff asserts was infringed by the challenged conduct. Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999); Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc).

The other tasks are to inquire "whether a constitutional violation occurred" and "whether the right violated was clearly established" at the time of the official's conduct. Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010); see Pearson, 555 U.S. at 231 (holding courts may inquire in either order). "Clearly established" refers to the adjudication of the "specific" right identified "at a high level of particularity," unless it has not been, in which "clearly established" means a reasonable public official should know something is deemed "manifestly included" within "more general applications" of the "core constitutional principle invoked." Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992). A reasonable public official in Virginia should look to the law of the Supreme Court of the United States, the Court of Appeals for the Fourth Circuit, and the Supreme Court of Virginia to determine whether the right is "clearly established." Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). If there is no such decision, a reasonable public official in this circuit should look to a "consensus of cases of persuasive authority from other jurisdictions, if such exists."[7] Id.; cf. Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.

---

[7] In 2017, for example, the Fourth Circuit held that a correctional official in South Carolina had acted unreasonably for not knowing in 2010 what clearly established law was applicable to correctional officials in Iowa, Texas, California, and Georgia, when the specific legal issue had been deemed not yet adjudicated by the Supreme Court of the United States, the Court of Appeals for the Fourth Circuit, or the Supreme Court of South Carolina. Booker v. S.C. Dep't of Corr., 855 F.3d 533, 544-45 (4th Cir. 2017). That official in South Carolina would also be deemed unreasonable for relying on a Fourth Circuit published decision that adjudicated the issue "manifestly included" within the more general applications of the core constitutional principle invoked, Adams v. Rice, 40 F.3d

1992) (recognizing qualified immunity is intended to protect public officials from making bad guesses in gray areas).

B. EXHAUSTION OF AVAILABLE ADMINISTRATIVE REMEDIES

Defendants argue that Plaintiff failed to exhaust available administrative remedies as required by 42 U.S.C. § 1997e(a). The exhaustion requirement is mandatory and "applies to all inmate suits about prison life[.]" Porter v. Nussle, 534 U.S. 516, 524, 532 (2002). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90 (2006). When a prison provides an administrative grievance procedure, the inmate must file a grievance raising a particular claim and pursue it through all available levels of appeal to "properly exhaust." Id.; Dixon v. Page, 291 F.3d 485, 490-91 (7th Cir. 2002).

"[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). "[W]hen prison officials prevent inmates from using the administrative process . . ., the process that exists on paper becomes unavailable in reality." Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006). A defendant has the burden to prove an inmate's failure to exhaust available administrative remedies. Jones v. Bock, 549 U.S. 199, 216 (2007). Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the plaintiff to show, by a preponderance of the evidence, that exhaustion occurred or

---

72 (4th Cir. 1994), and an unpublished case applying that published decision to reject the "specific right" identified "at a high level of particularity," Daye v. Rubenstein, 417 F. App'x 317, 319 (4th Cir. 2011). Cf. Booker, supra at 551-52 (Traxler, J., dissenting) ("Because Adams is binding, controlling authority that rejects Booker's claim, the majority errs by dismissing Adams and relying on cases outside this circuit to deny qualified immunity. See . . . Edwards, 178 F.3d at 251 ("If a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." (internal quotation marks and alteration omitted)).").

administrative remedies were unavailable through no fault of the plaintiff. See, e.g., Tuckel v. Grover, 660 F.3d 1249, 1254 (10th Cir. 2011).

VDOC Department Operating Procedure ("OP") 866.1, "Offender Grievance Procedure," provides the administrative remedies for inmates to resolve complaints, appeal administrative decisions, and challenge policies and procedures. The process provides correctional administrators means to identify potential problems and, if necessary, correct those problems in a timely manner. All issues are grievable except issues about policies, procedures, and decisions of the Virginia Parole Board; disciplinary hearing penalties and/or procedural errors; state and federal court decisions, laws, and regulations; and other matters beyond the VDOC's control. Inmates are oriented to the inmate grievance procedure when they enter the VDOC's custody and when they are transferred to other VDOC facilities.

Prior to submitting a grievance, the inmate usually must make a good-faith effort to informally resolve the issue by submitting an informal complaint form, which is available in housing units.[8] If the issue is not informally resolved, the inmate must file a regular grievance within thirty calendar days from the date of the occurrence or incident.[9] Only one issue per regular grievance may be addressed.[10] OP 866.1 requires an inmate to describe the "issue" and does not require the inmate to specify the responsible official or prospective defendant. See, e.g., Jones, 549 U.S. at 217-18 (discussing an identification requirement).

---

[8] An inmate is not required, however, to file an informal complaint about an alleged incident of sexual abuse.

[9] All grievances are considered "received" when VDOC staff date or date stamp it on the working day received. VDOC officials may modify the thirty-day limit for circumstances beyond the inmate's control or when a more restrictive time-limit has been established.

[10] For example, if a grievance alleged a violation of a specific policy and also alleged a pattern of conduct believed to be retaliation, the grievance could be rejected as presenting too many issues: a policy violation and retaliatory conduct.

Regular grievances may reviewed by multiple staff. A facility's warden conducts the first, "Level I" review. If the inmate is unsatisfied with the Level I determination, the inmate may appeal the determination within five days of receipt to Level II, which is usually done by a regional ombudsman.[11] A Level I response must be issued within thirty days, and a Level II response must be issued within twenty days. Expiration of the time limit without issuance of a response at any stage of the process automatically entitles an inmate to proceed to the next level.

Regular grievances that do not meet the filing requirements of OP 866.1 are returned to the inmate within two working days from the date of receipt with instructions, when possible, about how the inmate may remedy any deficiency.[12] An inmate may appeal an intake decision by sending the grievance and the intake decision to a regional ombudsman within five days of receipt. There is no further review of the intake decision. Notably, a grievance rejected at intake is deemed not properly filed.

VDOC OP 861.1, "Offender Discipline, Institutions," provides the administrative remedies for inmates to appeal disciplinary convictions. Except for a few circumstances not present in this case, an inmate may appeal a conviction to a warden within fifteen days of receiving the hearing report. The warden should respond in writing within twenty business days, addressing each issue raised in the appeal. The warden has numerous adjudication options, including affirming, vacating, and, notably, ordering a rehearing for a lesser offense code if the inmate was charged with an incorrect offense. Except for a few circumstances not present in this case, the inmate may then appeal to a regional administrator within fifteen days of receiving the

___

[11] Some issues are eligible for a third level of review, but for the issues involved in this case, Level II was the final level.

[12] A copy of the intake decision is kept in the inmate's grievance file.

warden's response. The regional administrator should respond within sixty business days and has the same adjudication options as the warden. There is no further review available.

## III.

After reviewing the record and viewing the inferences in a light most favorable to Plaintiff, I grant in part and deny in part Arms, Clary, hurt, Kegley, Kiser, Lee, Lowe, Mathena, Ponton, Sykes, and Taylor's motion for summary judgment. The motion is denied in part as to the following claims, which remain pending with the court: Ponton revoking 90 days' good-conduct time without an appropriate hearing, and the alleged retaliation by Taylor, Sykes, Arms, and Hurt.

The motion for summary judgment is granted in part as to the remaining claims against these defendants.

A. THE CLAIMS THAT PONTON AND WARDEN KISER FAILED TO GIVE PLAINTIFF A NEW DISCIPLINARY HEARING TO JUSTIFY THE LOSS OF 90 DAYS' GOOD-CONDUCT TIME

Plaintiff alleges that Ponton and Warden Kiser violated due process by failing to give Plaintiff a disciplinary hearing before convicting him of the lesser included offense code 111 and revoking earned good-conduct time.[13] A prisoner is entitled to certain due process protections for prison disciplinary proceedings when faced with the loss of good-conduct time. Wolff v. McDonnell, 418 U.S. 539, 564 (1974). Procedural due process requires advance written notice of the charges, a hearing, the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision. Id. at 564-71. Substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence." Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

---

[13] See Compl. ¶¶ 105-106.

Ponton's decision to simultaneous vacate the code 132 conviction and deem Plaintiff guilty of code 111 states a violation of a right to procedural due process that had been clearly established. Plaintiff never received notice that he would need to defend himself for a code 111 charge, "Intentionally Destroying, Altering, Damaging, or Defacing State or any Person's Property," nor did he ever receive a hearing to assert defenses particular to a code 111 charge before his good-conduct time was revoked.

Plaintiff also states a violation of substantive due process that had been clearly established. Ponton's rationale for finding Plaintiff guilty of code 111 was because "the shirt should not have been in his possession, and it should not have been altered from its original form." However, code 111 does not prohibit possession of an altered shirt; it prohibits its intentional alteration. The nature of the testimony during the hearing, at least as it is presently described, does not constitute "some evidence" that Plaintiff intentionally altered the shirt, regardless whether he possessed it. Accordingly, Ponton is not entitled to qualified immunity for the due process claims.

However, Warden Kiser is entitled to qualified immunity and summary judgment for the due process claims. Plaintiff fails to establish how Warden Kiser had any involvement with Ponton's decision or how Warden Kiser had authority to order a new hearing for a conviction already adjudicated by Ponton. Furthermore, any allegation that Warden Kiser's review of the code 132 conviction violated due process was mooted upon Ponton's decision to vacate that conviction.

Ponton's argument that Plaintiff failed to exhaust available administrative remedies is contradicted by the record. Plaintiff sought a remedy via OP 866.1, but neither OP 866.1 nor OP

18

861.1 allowed him to seek further review of Ponton's decision.  Accordingly, the procedural and substantive due process claims against Ponton remain pending.

## B. THE CLAIMS THAT TAYLOR SUBSTANTIALLY BURDENED RELIGIOUS EXERCISE PROTECTED BY THE FIRST AMENDMENT AND RLUIPA

Plaintiff claims that Taylor substantially burdened his exercise of religion in violation of the First Amendment and RLUIPA.[14]  Inmates "clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).  Also, RLUIPA, in relevant part, provides that no government shall impose a substantial burden on the religious exercise of an inmate unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-1(a).  A "substantial burden" occurs under either the First Amendment or RLUIPA if it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or . . . forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion . . . on the other hand."  Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (internal quotations omitted).

Plaintiff has not filed evidence or admissible testimony demonstrating how a sincerely-held religious exercise was substantially burdened.  Furthermore, nothing in the record supports an inference that any act or omission by Taylor was intended to deprive to Plaintiff of a religious right.  See id. at 195-96, 201-02 (holding that "unintended denials of religious rights do not violate" the First Amendment or RLUIPA).  Furthermore, the record does not reveal Plaintiff's informal complaint, regular grievance, and grievance appeal about any substantial burden to any

---

[14] See Compl. ¶ 98.

19

sincerely-held religious exercise. Accordingly, Taylor is entitled to qualified immunity and summary judgment for these religious claims under the First Amendment and RLUIPA.

## C. THE CLAIMS THAT SYKES AND KEGLEY CONSPIRED TO COVER UP THE ERRONEOUS CLASSIFICATION REPORT

Plaintiff alleges that Sykes and Kegley conspired to cover up the classification report that erroneously added two points to his security score, in violation of the Equal Protection Clause.[15] Establishing a civil conspiracy under 42 U.S.C. § 1983 requires a plaintiff to show that defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [plaintiff's] deprivation of a constitutional right." Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). Thus, a plaintiff must plead facts that would "reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." Id. Allegations of "parallel conduct and a bare assertion of a conspiracy" are not enough for a conspiracy claim to proceed. A Soc'y Without A Name v. Virginia, 655 F.3d 342, 347 (4th Cir. 2011).

The Fourteenth Amendment's Equal Protection Clause requires states to treat similarly situated individuals alike under the law. Plyler v. Doe, 457 U.S. 202, 216 (1982). To succeed on an equal protection claim, Plaintiff must show that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)).

Sykes and Kegley are entitled to qualified immunity and summary judgment for these claims because the claims consist of parallel conduct, labels, and conclusions. Plaintiff fails to describe Kegley's overt act in furtherance of the conspiracy for delivering the allegedly

---

[15] See Compl. ¶ 101.

erroneous report and then correcting it when Plaintiff objected to the alleged error. Furthermore, Plaintiff acknowledges that neither Kegley's nor Sykes' report resulted in the deprivation of a constitutional right because neither of those two reports was submitted to CCS for approval. Moreover, the alleged deprivation, which was the transfer to Red Onion, did not amount to a constitutional deprivation. See discussion infra Section III.D. Finally, Plaintiff fails to describe with whom he is similarly situated, illustrate how he was treated differently than others, or allege how that treatment was the result of intentional or purposeful discrimination based on any protected class. Accordingly, Sykes and Kegley are entitled to qualified immunity and summary judgment for these claims.

D. THE CLAIMS THAT TAYLOR AND MATHENA WERE NOT IMPARTIAL DECISION MAKERS AND THAT MATHENA, WARDEN KISER, SYKES, AND WASHINGTON DID NOT GIVE PLAINTIFF NOTICE OF THE ICA HEARING ON MARCH 24, DID NOT ALLOW PLAINTIFF TO BE PRESENT DURING THAT HEARING, AND TRANSFERRED PLAINTIFF TO RED ONION.

Plaintiff argues that Taylor and Mathena violated due process by not being impartial when deciding or approving changes to his classification.[16] Plaintiff also argues that Mathena, Warden Kiser, Sykes, and Washington violated due process by not giving him advance notice of the ICA hearing on March 24, not allowing him to be present during that ICA hearing, and transferring him to Red Onion.[17]

Taylor, Mathena, Warden Kiser, and Sykes are entitled to qualified immunity for these claims, and the complaint fails to state a claim against Washington. There is a two-step process to resolve a procedural due process claim about a prisoner's security classification. First, the court must determine whether the prisoner has a protectable liberty interest in avoiding the more stringent conditions of confinement in segregation. See, e.g., Incumaa v. Stirling, 791 F.3d 517,

---

[16] See Compl. ¶ 104.
[17] See Compl. ¶ 103.

526 (4th Cir. 2015). If the prisoner has no protectable liberty interest, then no process is due. See, e.g., Wilkinson v. Austin, 545 U.S. 209, 221 (2005) ("We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest . . . ."). If a liberty interest does exist, then a court must evaluate whether or not the prisoner received the minimally adequate process required to protect that interest. Incumaa, 791 F.3d at 526.

A liberty interest sufficient to give rise to procedural due process protections "may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies." Wilkinson, 545 U.S. at 221 (citations omitted). Although the Constitution itself does not give Plaintiff a liberty interest in avoiding transfer to more adverse conditions of confinement, state prison regulations or procedures may create such an interest if the more stringent conditions "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 483-84 (1995).

Assuming, arguendo, that VDOC policy creates a liberty interest to avoid the conditions of Level S at Red Onion, Plaintiff's brief confinement there, and the attendant conditions he allegedly experienced, did not constitute an "atypical and significant hardship" compared to the "ordinary incidents of prison life" he could expect. See id. at 484. The mere limitations on privileges, property, and activities for administratively segregated inmates "fall[] within the expected perimeters of the sentence imposed by a court of law." Sandin, 515 U.S. at 485; see Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991) (holding that changes in a prisoner's "location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges — matters which every prisoner can anticipate are contemplated by his original sentence to prison — are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable

22

them to manage the prisons safely and efficiently"). The duration and described conditions of Plaintiff's confinement at Red Onion do not implicate the concerns discussed in <u>Wilkinson v. Austin</u>, 545 U.S. 209, 213 (2005), and <u>Incumaa v. Stirling</u>, 791 F.3d 517, 519 (4th Cir. 2015).[18] Level S inmates experience more restrictive conditions than Level 5 inmates in general population, but that fact does not render such confinement atypical or significantly harsh. Also, inmates do not have a protected liberty interest in earning a specific rate of good-conduct time, and courts have held that the effect of a classification change on the ability to earn good-conduct time is too speculative to constitute a deprivation of a protected liberty interest. <u>See, e.g.,</u> <u>Greenholtz v. Inmates of Neb. Penal & Corr. Complex</u>, 442 U.S. 1, 7 (1979); <u>Luken v. Scott</u>, 71 F.3d 192, 193-94 (5th Cir. 1995) (citing <u>Meachum v. Fano</u>, 427 U.S. 215, 229 n.8 (1976)); <u>DeBlasio v. Johnson</u>, 128 F. Supp. 2d 315, 329-30 (E.D. Va. 2000), <u>aff'd</u>, 13 F. App'x 96 (4th Cir. 2001); <u>see also Wolff</u>, 418 U.S. at 557-58 (recognizing the Constitution does not guarantee good-conduct time for satisfactory behavior while in prison).

Also, the record does not establish that Plaintiff exhausted available administrative remedies about the impartiality of Taylor's or Mathena's involvement with Plaintiff's classification and transfer to Red Onion. Accordingly, Plaintiff fails to establish that his

---

[18] The short duration and conditions of Plaintiff's confinement at Red Onion do not implicate the concerns discussed in <u>Wilkinson v. Austin</u>, 545 U.S. 209, 213 (2005), and <u>Incumaa v. Stirling</u>, 791 F.3d 517, 519 (4th Cir. 2015). In <u>Wilkinson</u>, the Supreme Court found that inmates had a protected liberty interest in avoiding assignment to a state "supermax" prison. Without undergoing a point-by-point comparison of the conditions between segregation and general population, the Supreme Court distinguished the supermax conditions from normal segregation for three primary reasons. First, inmates in the supermax prison were "deprived of almost any environmental or sensory stimuli and of almost all human contact."[18] <u>Wilkinson</u>, 545 U.S. at 214. Second, the inmates were assigned to the supermax prison for "an indefinite period of time, limited only by [the] inmate's sentence." <u>Id.</u> at 215. Third, inmates otherwise eligible for parole lost that eligibility while imprisoned at the supermax prison. <u>Id.</u> at 215. "[A]ny of these conditions standing alone might not be sufficient to create a liberty interest, [but] taken together[,] they impose[d] an atypical and significant hardship within the correctional context." <u>Id.</u> at 224. Similarly in <u>Incumaa</u>, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax based on the prisoner's twenty-year confinement there and its isolating and restrictive living conditions, including a highly intrusive strip search every time he left his cell for twenty years. 791 F.3d at 531-32.

confinement at Red Onion constituted an atypical and significant hardship in relation to the ordinary incidents of prison life, and Taylor, Mathena, Warden Kiser, and Sykes are entitled to qualified immunity and summary judgment for these claims. I dismiss The claims against Washington are dismissed without prejudice for failing to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915A(b)(1) and 42 U.S.C. § 1997e(c).[19]

### E. THE RETALIATION CLAIMS

Plaintiff alleges that defendants' retaliation is because of the grievances and lawsuits that he had filed. The Court of Appeals for the Fourth Circuit held in April 2017 that it was clearly established to a reasonable prison official that, as of 2010, retaliation against an inmate because of that inmate's administrative grievance would violate the First Amendment. Booker, 855 at 543-44. Also, it has long been clearly established that prison officials may not retaliate against an inmate for accessing courts. See, e.g., Hudspeth v. Figgins, 584 F.2d 1345, 1348 (4th Cir. 1978).

For a claim of retaliation to survive summary judgment, a plaintiff must produce sufficient evidence that (1) the speech was protected, (2) the alleged retaliatory action adversely affected the protected speech, and (3) a causal relationship existed between the protected speech and the retaliation. Raub v. Campbell, 785 F.3d 876, 885 (4th Cir. 2015), cited by Hoye v. Gilmore, No. 7:15cv203, 2017 U.S. App. LEXIS 10699, at *2, 2017 WL 2615449, at *1 (4th Cir. June 16, 2017). Bare assertions of retaliation do not establish a claim of constitutional dimension. Adam, 40 F.3d at 74-75.

"A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of [the protected] rights."

---

[19] Service has not yet been accomplished on Washington.

<u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 500 (4th Cir. 2005). The plaintiff must allege sufficient facts to warrant concern that the alleged retaliation might have a chilling effect on the exercise of the right and show that he suffered more than <u>de minimis</u> inconvenience. <u>American Civ. Liberties Union v. Wicomico Cnty.</u>, 999 F.2d 780, 785-86 n.6 (4th Cir. 1993).

"[I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [state actor] would not have taken the alleged retaliatory action." <u>Id.</u> (quoting <u>Huang v. Bd. of Governors of the Univ. of N.C.</u>, 902 F.2d 1134, 1140 (4th Cir. 1990)). Thus, "[i]n order to establish [a] causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." <u>Constantine</u>, 411 F.3d at 501. Although it has been often repeated that an inmate's claim of retaliation should be regarded with skepticism, the record and all inferences therefrom must be drawn in a plaintiff's favor when adjudicating a prison official's motion for summary judgment. <u>Compare Adams</u>, 40 F.3d at 74, with <u>Anderson</u>, 477 U.S. at 248.

1. <u>The claim that Taylor retaliated</u>

Plaintiff's first retaliation claim is that Taylor retaliated against Plaintiff because of his grievances and lawsuits.[20] After viewing the allegations, the record, and all inferences in a light most favorable to him, Plaintiff has stated a violation of clearly established law. Plaintiff has repeatedly filed grievances and lawsuits about Taylor, prompting Taylor's threat about "throwing stones." Soon thereafter, Taylor ordered Plaintiff into segregation, kept him in segregation for the alleged "inflammatory statements" for which he was never charged, created an erroneous

---

[20] <u>See</u> Compl. ¶ 97.

classification report to cause a transfer to Red Onion, and falsified an ICA report to ensure Plaintiff could not challenge the transfer. Consequently, Plaintiff was transferred from a Level 4 facility to Red Onion, a Level S facility, where he was processed through the VDOC's Step Down Program and earned less good-conduct time. See, e.g., Rivera v. Va. Dep't of Corr., No. 7:15cv156, 2016 U.S. Dist. LEXIS 169609, at *1-10, 2016 WL 7165997, at *1-4 (W.D. Va. Dec. 8, 2016) (describing the more restrictive conditions of confinement at Level S relative to conditions in general population). These consequences would likely deter a person of ordinary firmness from filing grievances or lawsuits.

It is not clear whether Plaintiff exhausted available administrative remedies about Taylor's alleged retaliation of ordering Plaintiff into segregation based on Wicker's accusation of an "inflammatory statement." Plaintiff submitted a grievance about why he was placed in segregation because of Taylor. (ECF No. 36-8, pageid# 486.) Although this grievance does not identify Taylor by name, it does describe Taylor's alleged retaliatory act of ordering Plaintiff into segregation. See, e.g., Jones, 549 U.S. at 217-18 (discussing an identification requirement). This second grievance was not successful, and Plaintiff appealed the disposition to the Regional Ombudsman. (ECF No. 36-8, pageid# 488.) The record, however, does not describe the disposition of the regular grievance or the Regional Ombudsman's review. Accordingly, the lack of evidence in the current record presently prevents adjudication of this claim via 42 U.S.C. § 1997e(a).

The record shows that Plaintiff exhausted remedies about the erroneous classification report allegedly prepared by Taylor, which caused the transfer to Red Onion. However, there is no dispute of a material fact about the lack of grievances concerning any other alleged retaliatory

26

act by Taylor.  In accord with 42 U.S.C. § 1997e(a), Taylor is entitled to summary judgment for any other claim of retaliation that had not been exhausted.

2. The claims that Mathena, Warden Kiser, Sykes, and Washington retaliated against Plaintiff by not giving Plaintiff notice of the ICA hearing on March 24, not allowing Plaintiff to be present during that hearing, and transferring Plaintiff to Red Onion

Plaintiff argues that Mathena, Warden Kiser, Sykes, and Washington retaliated against him by not giving him advance notice of the ICA hearing on March 24, not allowing him to be present during that ICA hearing, and transferring him to Red Onion.[21]  Plaintiff also argues that Sykes retaliated by falsifying the ICA report to suggest Plaintiff had attended.  By March 26, defendants Mathena and Warden Kiser both approved Sykes' report and recommendation that inferred Plaintiff was present for the hearing.

Mathena and Warden Kiser are entitled to qualified immunity.  Neither Mathena nor Warden Kiser were named as a defendant in any one of the three prior civil actions, and Plaintiff fails to explain beyond mere hyperbole how Mathena was aware by March 26 that Plaintiff had filed grievances or lawsuits about Taylor or Wicker.  Furthermore, Plaintiff fails to describe how Mathena or Warden Kiser was aware by March 26 that Plaintiff was not present for the ICA hearing on March 24 when Sykes' ICA report clearly suggests he was present.  Furthermore, nothing in Warden Kiser's grievance responses, one of which found in Plaintiff's favor, states a plausible claim of retaliation.

The retaliation claim against Washington consists merely of parallel conduct, labels, and conclusions.  Furthermore, there is nothing to support the idea that Washington's authorization for a transfer to Red Onion had anything to do with grievances or lawsuits or to find a causal

---

[21] See Compl. ¶ 103.

relationship between the grievances or lawsuits and the transfer. Accordingly, these claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b)(1) and 42 U.S.C. § 1997e(c).

However, Sykes is not entitled to qualified immunity on the present record. Plaintiff alleges that Sykes created an erroneous classification report and an erroneous ICA report to ensure Plaintiff's transfer to Red Onion, which is a transfer that would likely deter a person of ordinary firmness from filing grievances or lawsuits. Furthermore, Plaintiff alleges that Sykes committed these retaliatory acts in support of his supervisor, Taylor. Accordingly, the retaliation claim against Sykes remains pending with the court.

### 3. The claims that Lowe retaliated by convicting Plaintiff and denying his pre-hearing requests and that Clary, Arms, and Lee similarly retaliated by not reviewing a video recording

Plaintiff argues that Lowe retaliated, ostensibly by denying Plaintiff's requests to watch a video recording, denying Plaintiff's request for three inmates to testify; and finding Plaintiff guilty of code 132, "Possession/Construction of a Device Designed to Deceive Staff."[22] Plaintiff further alleges that Clary, Arms, and Lee similarly retaliated by not reviewing the video recording.[23]

Lowe, Clary, Arms, and Lee are entitled to qualified immunity for these retaliation claims. First, the denial of the discovery had a de minimis effect because the code 132 conviction was ultimately vacated on appeal and the grey shirt was presented during the hearing regardless of Plaintiff's discovery requests. The discovery requests were not material to the charge "Possession/Construction of a Device Designed to Deceive Staff," and there was no dispute as to the possession or design element. Thus, Lowe was permitted to deny Plaintiff's

---

[22] See Compl. ¶ 99.
[23] See Compl. ¶ 100.

discovery requests for good cause. See, e.g., Wolff, 418 U.S. at 564-71. Plaintiff's conclusory allegations about Lowe's, Clary's, Arms', and Lee's retaliation are not sufficient to state a claim. Although Plaintiff exhausted administrative remedies about Lowe not granting Plaintiff's requests, the record does not show that Plaintiff pursued administrative remedies about Clary, Arms, and Lee declining to review a video recording. Accordingly, Lowe, Clary, Arms, and Lee are entitled to qualified immunity and summary judgment for these claims.

### 4. The claims that Arms and Hurt retaliated by modifying the gray shirt

Plaintiff alleges that Hurt and Arms retaliated by altering the gay shirt while it was in their possession.[24] Arms testified that the long sleeves had been stitched on to the body of the shirt, but Plaintiff alleges that the sleeves had never been modified while he possessed it. Ponton relied on Arms' testimony to convict Plaintiff on appeal and revoke earned good-conduct time.

Temporal proximity between the protective activity and the adverse act may be sufficient to make an initial prima facie showing of causation. See Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 579 (4th Cir. 2015). However, timing alone generally cannot defeat summary judgment once a defendant offers a convincing, nonretaliatory explanation. See, e.g., Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1066 (10th Cir. 2009).

Hurt and Arms are not presently entitled to qualified immunity or summary judgment. Neither Hurt nor Arms filed evidence to disclaim any retaliatory motive or to offer a convincing, nonretaliatory explanation for altering the shirt while it was in their possession, in contrast to Plaintiff's allegations. Furthermore, Plaintiff challenged the shirt's authenticity during the disciplinary appeal under OP 861.1, and that issue was not grievable under 866.1. Accordingly, Arms and Hurt are not entitled to summary judgment via 42 U.S.C. § 1997e(a).

---

[24] See Compl. ¶ 102.

# IV.

Defendant Locust filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[25] The standard for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires me to accept a plaintiff's factual allegations as true. A complaint needs "a short and plain statement of the claim showing that the pleader is entitled to relief" and sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). A plaintiff's basis for relief "requires more than labels and conclusions . . . ." Id. Therefore, a plaintiff must "allege facts sufficient to state all the elements of [the] claim."[26] Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003).

The allegations against Locust stem solely from Locust's responses – or alleged lack of responses – to his grievances, letters, and appeals.[27] In his response to the motion to dismiss, Plaintiff also complains that Locust should have exercised greater oversight over her subordinates.

Supervisory liability under § 1983 may not be predicated on the theory of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 663 n.7, 691-94 (1978); Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001). Section 1983 requires a showing of personal fault on

---

[25] The parties received reasonable and explicit notice that the court may convert a motion to dismiss that references matters outside the pleadings into a motion for summary judgment when the Clerk issued a timely Roseboro notice. See Fed. R. Civ. P. 12(d); Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975).

[26] Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). Thus, a court screening a complaint under Rule 12(b)(6) can identify pleadings that are not entitled to an assumption of truth because they consist of no more than labels and conclusions. Id. Although I liberally construe pro se complaints, Haines v. Kerner, 404 U.S. 519, 520-21 (1972), I do not act as an inmate's advocate, sua sponte developing statutory and constitutional claims not clearly raised in a complaint. See Brock v. Carroll, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985); see also Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978) (recognizing that a district court is not expected to assume the role of advocate for a pro se plaintiff).

[27] See Supp. Compl. ¶ 16.

the part of a defendant either based on the defendant's personal conduct or another's conduct in execution of the defendant's policies or customs. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (discussing the deliberate indifference standard for a supervisor's liability under § 1983). Plaintiff does not allege Locust's personal involvement with any of the other allegation other than his dissatisfaction with her delayed responses to his letters. However, Plaintiff does not have a constitutional right to participate in grievance proceedings. See Booker, 855 F.3d at 541 ("Adams establishes a clear rule: inmates have no constitutional entitlement or due process interest in access to a grievance procedure. An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process, for example."). Furthermore, Plaintiff does not allege that Locust knew about any of Plaintiff's earlier litigation or that Locust retaliated against him based on his grievances or complaints. Additionally, Plaintiff fails to demonstrate what procedural relationship Locust has in the exhaustion process defined in OP 866.1 or OP 861.1 or what her official duty to Plaintiff was about his attempts to file grievances and appeals to other VDOC staff. Even if the timing or quality of her responses violated some VDOC policy or procedure, such a violation does not state a constitutional claim. See United States v. Caceres, 440 U.S. 741, 752-55 (1979); Riccio v. Cnty. of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue). Accordingly, the claims against Locust fail to state a claim, and Locust's motion to dismiss is granted.

## V.

For the foregoing reasons, I grant Locust's motion to dismiss, and I grant in part and deny in part Taylor, Clary, Arms, Sykes, Mathena, Lowe, Kiser, Lee, Kegley, Hurt, and Ponton's motion for summary judgment. The claims against Washington are dismissed without prejudice.

The claims remaining are about Ponton finding Plaintiff guilty of code 111 and the alleged retaliation by Taylor, Sykes, Arms, and Hurt.

Having resolved the question of qualified immunity, the parties may engage in discovery within the next sixty days, and discovery shall be completed within thirty days thereafter. The parties may file dispositive motions no sooner than within fifteen days of the completion of discovery.

**ENTER**: This 15 day of August, 2017.

Senior United States District Judge